

# In the Missouri Court of Appeals
# Eastern District

CROWN DIVERSIFIED INDUSTRIES, )     No. ED110120
CORP., ET AL., )
    )
      Respondent, )
    )
    )     Appeal from the Circuit Court of
    )     St. Louis County
      vs. )     Cause No. 19SL-CC05809
    )            19SL-CC05809-01
JAKE ZIMMERMAN, ASSESSOR, )
ST. LOUIS COUNTY, MISSOURI, )     Honorable Brian H. May
    )
      Appellant. )     Filed: June 30, 2023

## OPINION

Appellant Jake Zimmerman, the Assessor for St. Louis County, Missouri (Assessor), appeals from the St. Louis County circuit court's judgment in favor of Crown Diversified Industries, Corp. and other St. Louis County commercial property owners et al. (Taxpayers), reversing the order of the Missouri State Tax Commission (STC) and remanding for retrial. The STC found the Taxpayers did not produce persuasive evidence supporting their discrimination claims following the Assessor's 2017 reassessment. The STC also found that the hearing officer did not abuse her discretion when quashing the subpoenas directing the Assessor and some of his appraisers to appear for depositions and denying certain discovery requests. Following review, the circuit court found the STC erred, reversed the STC's decision and remanded the matter for retrial. When doing so, the circuit court ordered the STC to: 1) determine the actual level of

assessment pursuant to the formula in *Zimmerman v. Mid-America Fin. Corp.*, 481 S.W.3d 564 (Mo. App. E.D. 2015); 2) apply a 3% threshold or difference between sold and unsold properties to determine if sales chasing is practically significant; 3) determine if there is unlawful discrimination against Taxpayers following Assessor's 2017 reassessment; and 4) allow Taxpayers to conduct further discovery, including the deposition of Assessor and additional appraisers as well as analyze additional data, Assessor's program and other assessment practices. We reverse the circuit court's judgment because we conclude that the STC decision rejecting Taxpayers' discrimination claims is supported by competent and substantial evidence and the STC did not abuse its discretion when ruling on the discovery matters.

## Factual and Procedural Background

Taxpayers are approximately 2,625 St. Louis County commercial property owners who allege that the Assessor assigned discriminatory assessments to their properties. In 2017, Assessor performed a statutorily mandated biennial appraisal of the commercial properties in St. Louis County. When calculating the commercial property assessments, Assessor utilized the Computer Assisted Mass Appraisal (CAMA) system where property data is entered and a computerized mathematical formula applies the relevant numerical factors before ultimately identifying the value.[1] Following the CAMA determination, an appraiser completes a final review of all improved properties to decide whether or not any adjustments to the CAMA value are necessary. Following a final review with or without an adjustment, the appraiser determines the fair market value (FMV). Next the Assessor multiplies the FMV by the applicable *Assessment Ratio*, or 32%, to determine the *Assessed Value*.

---

[1] In their brief, Taxpayers also refer to Assessor's computer assisted modeling software system as the Independent Appraisal System (IAS) which is the same as or similar to CAMA.

2

In short, this mathematical equation is used to determine the tax liability or the amount of the property owner's bill. The *Assessment Ratio* is determined by statute and varies depending on the type of real property. Since Taxpayers' properties are commercial properties as defined by Section 137.016.1(3) RSMo (Cum. Supp. 2008),[2] 32% is the *Assessment Ratio* or the applicable rate pursuant to Section 137.115.5(1)(c).[3] For example, if a commercial property's FMV is $1 million, then this property has an *Assessed Value* of $320,000 because 1,000,000 x 0.32 = 320,000.

A St. Louis County property owner may appeal the Assessor's valuation to the St. Louis County Board of Equalization ("BOE") pursuant to Section 138.180, RSMo. It reads:

> Any person may appeal in writing to the board of equalization from the assessment of his property, which appeal shall specify the matter of which he complains and which shall be filed at the office of the assessor of the city on or before the second Monday in July of each year, and any person so appealing shall have the right of appeal from decisions of the local board to the state tax commission as provided by law.

If a taxpayer is successful at the BOE and the FMV or valuation is reduced, then the 32% assessment rate is applied to the reduced value.[4] If a taxpayer is unsuccessful at the BOE, the taxpayer may appeal to the STC, pursuant to Section 138.430.1.

Among other factors potentially affecting this process, sales chasing or selective reappraisal occurs when sold and unsold properties are appraised differently or, more specifically, when the Assessor assigns a value to the sold property based on the sales price

---

[2] All further statutory references are to RSMo (Cum. Supp. 2008), unless otherwise indicated.

[3] Effective August 28, 2021, Section 137.115.5(1)(c) is the applicable statutory reference whereas Section 137.115.5(3) was the applicable statute at the time Taxpayers filed their claim. The language is mostly identical and we will refer to the more current statutory version. It reads:
> "All subclasses of real property, as such subclasses are established in Section 4(b) of Article X of the Missouri Constitution and defined in section 137.016, shall be assessed at the following percentages of true value ….
> (c) [f]or real property in subclass (3), thirty-two percent."

[4] Pursuant to Section 138.060.2, the county clerk shall correct all erroneous assessments and adjust the tax books according to the orders of the BOE or the STC. Section 138.060.2

instead of identifying the value following normal procedures. When sales chasing occurs, ratio studies used to determine the common level of assessment may become unreliable. As another potential disruptive influence, regressivity occurs where low-value properties are assessed at a higher percentage of FMV than high-value properties, triggering a higher tax burden for the low-value property owners and resulting in discrimination.

Represented by Joseph Sansone Company (Sansone) and Property Assessment Review (PAR), Taxpayers initially filed their appeals with the St. Louis County BOE challenging their 2017 reassessments. Of the 2,625 complainant number, 1,759 challenged the Assessor's valuation or FMV assignment to their properties when appealing to the BOE. Some of these property owners were successful and received adjustments while others were unsuccessful when attempting to lower their property valuations. The remaining 866 did not challenge the valuation or Assessor's assigned FMV, waived their BOE hearing and chose to present their discrimination claims directly to the STC.

In October 2017, all 2,625 commercial property owners appealed to the STC as allowed by statute. Initially, a STC hearing officer met with the parties and entered a scheduling order with their input and approval. The discovery process extended over several months, while the parties prepared, exchanged and submitted written testimony and numerous exhibits. Taxpayers submitted their first discovery request in May 2018 and the discovery period was extended on at least one occasion.

To prevail on this discrimination claim, Taxpayers must prove an intentional plan of discrimination, or in the absence of an intentional plan, the taxpayer must demonstrate the assessing authorities intentionally undervalued other similar properties. *State ex rel. Ashby Road Partners, LLC v. State Tax Com'n*, 297 S.W.3d 80, 85 (Mo. banc 2009). Discrimination exists if

the taxpayer's level of assessment ratio is "grossly excessive" when compared to the common or average assessment ratio of the other similar properties. *Cupples Hesse Corp. v. State Tax Com'n*, 329 S.W.2d 696, 700 (Mo. 1959).

Among the approximate 2,625 litigant class asserting ratio discrimination claims before the STC, 2,156 Taxpayers relied on the FMV contained in the BOE decision letters. Of the 2,156, 1,887 did not witness any change from the FMV attributed to their properties by the Assessor and 269 utilized a FMV as reduced by the BOE. The remaining 469 litigants relied on the FMV as later adjusted by the STC.

When analyzing possible ratio discrimination, Taxpayers retained Robert Gloudemans and the Assessor retained Josh Myers as expert witnesses to more closely scrutinize the common or average level of assessment. Following a ratio study, an expert can analyze the level of assessment after comparing the Assessor's valuations of the representative sample to a market value figure typically influenced by sale prices. The ratio study allows an expert to determine the uniformity in the appraisal and assessment process after reviewing these calculations in a statistical format.

The expert calculations were within a narrow margin of separation; Gloudemans concluded a median level of appraisal of 93.7% and a median level of assessment of 29.98% while Myers concluded a median level of appraisal of 95.4% and a median level of assessment of 30.53%. The experts disagreed about existing sales chasing and regressivity affecting the median or common level of assessment. Gloudemans concluded that his calculations about existing sales chasing exceeded his preferred 3% tolerance level while Myers determined that any existing sales chasing did not exceed his preferred 5% tolerance level. In contrast to Myers, Gloudemans concluded the level of regressivity was also problematic.

Following the evidentiary hearing, the hearing officer found Taxpayers failed to provide persuasive evidence or argument supporting their discrimination claims. On December 4, 2019, the STC entered an order, affirming the hearing officer and adopting her decisions and order. Pursuant to Section 536.100, Taxpayers filed a petition for review with the St. Louis County circuit court. Following judicial review, the court granted Taxpayers' requested relief by reversing the STC Order and remanding for retrial with directions. In response, Assessor appeals the circuit court judgment favoring Taxpayers. Consequently, this court reviews the decision entered by the STC.[5]

**Standard of Review**

We review the STC's decision and not the judgment of the circuit court. *Bateman v. Rinehart*, 391 S.W.3d 441, 444 (Mo. banc 2013). This court must determine whether the STC's decision: (1) violates constitutional provisions; (2) is in excess of the statutory authority or jurisdiction of the agency; (3) is not supported by competent and substantial evidence upon the record as a whole; (4) is, for any other reason, not authorized by law; (5) is made upon unlawful procedure or without a fair trial; (6) is arbitrary, capricious, or unreasonable; or (7) constitutes an abuse of discretion. *Id*. at 444–45, *quoting J.H. Berra Constr. Co., Inc. v. Holman*, 152 S.W.3d 281, 282 (Mo banc. 2005). This Court defers to the STC's judgment on factual matters, but reviews *de novo* issues of statutory or constitutional interpretation. *Id*. at 445.

The proper methods for valuation and assessment are delegated to the STC, an agency with expertise in matters of property tax assessment, and this Court will not substitute its judgment for the STC. *Savage v. State Tax Com'n*, 722 S.W.2d 72, 75 (Mo. banc 1986). We consider the evidence in the light most favorable to the STC's decision and defer to the STC's

---

[5] Taxpayers filed the first brief in this court, alleging error in the STC order, pursuant to Eastern District Rule 355.

findings on credibility of witnesses and weight of evidence. *Id*. If the evidence supports either of two opposed findings we are bound by the STC's determination. *Id*. "We review the decision of the [STC] and not the hearing officer," *Cohen v. Bushmeyer*, 251 S.W.3d 345, 350 n. 4 (Mo. App. E.D. 2008), unless, as here, the STC incorporated the decision of the hearing officer, in which case we consider both together. *Loven v. Green County*, 94 S.W.3d 475, 477 (Mo. App. S.D. 2003); *Peruque LLC v. Shipman*, 352 S.W.3d 370, 374 (Mo. App. E.D. 2011). We will uphold the STC's decision unless it is not supported by competent and substantial evidence or it is arbitrary, capricious, unreasonable, unlawful or exceeds its jurisdiction. *Savage*, 722 S.W.2d at 74-75.

## Discussion

In response to Assessor's appeal, Taxpayers raise four points criticizing the STC decision. In Point I, they assert that the STC failed to properly calculate the actual level of assessment and FMV for most of the taxpayers' properties and they failed to properly compare the actual level of assessment for each property with the common level of assessment. In Point II, Taxpayers allege that the STC failed to follow assessment standards and adopted the wrong common level of assessment by ignoring the effects of practically significant sales chasing and relying on an invalid ratio study. In Point III, they claim that the STC further erred after failing to find persuasive evidence of regressivity when it adopted the median rather than the weighted mean as the proper measure to calculate the common level of assessment. In Point IV, Taxpayers argue that it was an abuse of discretion to quash subpoenas to depose the Assessor and additional appraisers as well as deny additional discovery into Assessor's assessment practices.

These arguments are consolidated for efficiency purposes. Initially we address Points I-III, where Taxpayers allege the STC erred when failing to find that the Assessor discriminated

7

against Taxpayers in the 2017 reassessment. Then, we address Point IV, where Taxpayers allege an abuse of discretion by the hearing officer when quashing the subpoenas involving depositions and denying certain discovery efforts.

## Points I - III

To prevail in a discrimination claim, the taxpayer must prove an intentional plan of discrimination, or in the absence of an intentional plan, the taxpayer must demonstrate the assessing authority intentionally undervalued other similar properties. *State ex rel. Ashby Road Partners, LLC*, 297 S.W.3d at 85. This process is sometimes referred to as ratio discrimination.

The Fourteenth Amendment to the United States Constitution requires equal protection of the laws. Article X, § 3, of the Missouri Constitution requires uniformity when taxing similar properties in similar locations. The constitutional mandates of both the United States and Missouri Constitutions allow for relief following proof of an intentional plan to discriminate. Additionally, discrimination also exists when the disparity between the complaining taxpayer's actual level of assessment and the common level of assessment is "grossly excessive." *Savage*, 722 S.W.2d at 78-9. However, simply overvaluing a specific property does not establish discrimination. *Cupples Hesse Corp.*, 329 S.W.2d at 700. The court and the STC remain unburdened to correct *de minimus* errors and recognize practical uniformity, not the unattainable absolute uniformity, as the constitutional goals. *Savage*, 722 S.W.2d at 79. Upon a showing of discrimination, a taxpayer's assessment will be reduced to the percentage at which others are taxed. *Id.*

***The STC properly calculated the actual level of assessment for Taxpayers' properties.***

Here, Taxpayers contend that the Assessor failed to properly calculate the FMV and actual level of assessment for many of their properties, effectively masking the discriminatory

8

taxation. The STC found those calculations were supported by competent and substantial evidence and we agree. A property's *Assessed Value* determines tax liability. The *Assessed Value* is determined by multiplying the FMV by the *Assessment Ratio*, which is 32% for commercial properties, pursuant to Sec. 137.115.5(1)(c). As previously noted, the equation for a $1 million subject property would be: FMV ($1,000,000) x *Assessment Ratio* (32%) = *Assessed Value* ($320,000).

When analyzing a discrimination claim, the median or common level of assessment for similar properties is compared to the actual *Level of Assessment* for the subject property. *Savage*, 722 S.W.2d at 74. To identify the *Level of Assessment*, the *Assessed Value* is divided by the FMV, reducing this figure to a percentage. This calculation is further simplified as follows: *Assessed Value* (320,000) ÷ FMV (1,000,000) = *Level of Assessment* (32%). Pursuant to the law, the *Level of Assessment* percentage is compared to the percentage representing the common level of assessment for similar properties to determine if it is "grossly excessive" or discriminatory. *Id.* at 79. When determining the actual *Level of Assessment*, Taxpayers argue that the Assessor's valuation must be used, even when the BOE later lowers the FMV following the appeal process resulting in a revised *Assessed Value* (also referred to as a revised assessment). In short, Taxpayers contend the Assessor's valuation is always inserted into the equation, ignoring the BOE altered valuation and revised *Assessed Value*. If the BOE later lowers the subject property's FMV, the *Assessed Value* is essentially lowered. For example, if the BOE lowers the FMV from $1 million to $850,000 during the appeal process then the subject property's current *Assessed Value* falls to $272,000, after multiplying the revised FMV by the 32% *Assessment Ratio*.

Taxpayers contend *Mid-America*, supports their position that assessor's *Assessed Value* is applied regardless of any later value adjustment by BOE. 481 S.W.3d at 574. Applying *Mid-*

9

*America* to the current example, Taxpayers argue that the STC is obligated to apply the Assessor's original *Assessed Value* of $320,000 when analyzing the discrimination claim. *Id*. More specifically, the Assessor's $320,000 *Assessed Value* should be divided by the BOE's revised FMV of $850,000, resulting in a 37.6% *Level of Assessment*. When considering any existing discrimination pursuant to this example, the STC accordingly compares the difference between the 37.6% *Level of Assessment* rooted in the assessor's valuation and the percentage representing the *median level of assessment* for similar situated properties. *Id.* at 573. The greater the disparity between these percentages, the more likely that discrimination exists.

Conversely, Assessor argues that the revised assessed value is the applicable measurement when determining the *Level of Assessment*, not his original figure. In other words, Assessor argues that his original *Assessed Value* becomes irrelevant following the FMV revision that triggered an updated *Assessed Value*, leaving the BOE adjusted figures as the more proper measurement for analyzing discrimination claims. When applying this argument to the earlier example, the revised *Assessed Value* of $272,000 becomes the applicable measurement when determining the *Level of Assessment*, not Assessor's original $320,000 figure. The Assessor relies on *Ulman v. Evans*, 247 S.W.2d 693, 697 (Mo. 1952), where the BOE adjusted the property's FMV to determine the true value resulting in a revised assessment.

In *Mid-America*, property owner challenged the 2007 tax assessment after the St. Louis County Assessor initially identified the property's FMV as $1,460,800, and calculated the *Assessed Value* as $467,450 after applying the 32% *Assessment Ratio*. 481 S.W.3d at 566. Later, the county Board of Equalization ("county BOE") lowered the FMV to $1,122,000. *Id.* at 567. Then, the *Mid-America* property owner appealed to the STC, alleging discrimination by the

Assessor while specifying that it was not challenging the revised, lowered property valuation of $1,122,000. *Id.* at 567.

Ultimately, the hearing officer determined that the Assessor attributed a 29.4% median assessment level to similar St. Louis commercial properties but he applied a 42% *Level of Assessment* to the *Mid-America* property. *Id.* at 573. The hearing officer "could have also calculated the 42% *Level of Assessment* by dividing the Assessor's *Assessed Value*, $467,450," by $1,122,000, the revised FMV for the property. *Id*. (emphasis added) The hearing officer concluded that the disparity between the 29.4% and 42% was grossly excessive or discriminatory, a decision adopted by the STC. *Id.* at 576.

Assessor appealed to the Eastern District, arguing that the STC erroneously calculated the 42% *Level of Assessment* through incorrect methodology. *Id*. at 573. Specifically, Assessor contended the STC erroneously relied on the Assessor's *Assessed Value* of $467,450, which was derived from Assessor's initial $1,460,800 valuation, but his *Assessed Value* became irrelevant after the county BOE lowered the property's FMV to $1,122,000. *Id*. Rejecting this argument, the Eastern District held that the proper method of determining discrimination is to compare the Assessor's actual *Level of Assessment* for the property to the median level of assessment of similar properties. *Id*. at 574.

In *Ulman*, the property owner challenged her lot's property tax assessment by the City of St. Louis Assessor.[6] 247 S.W.2d at 693. Initially, the city assessor valued her property at $650 but the city Board of Equalization (city BOE) later determined the true value or FMV to be closer to $450. *Id.* at 694. Consequently, the city BOE revised, or "equalized," the assessment (or *Assessed Value*) by lowering the FMV from $650 to $450. *Id*. at 697.

---

[6] The property consisted of a building and a lot, but the property owner only contested the valuation of the lot.

After claiming the city BOE lowered valuation of $450 was high, the property owner appealed to the STC which affirmed the BOE's revised valuation, not the Assessor's initial valuation. *Id.* at 694. Then, the *Ulman* property owner appealed in circuit court, claiming the lowered $450 valuation or FMV was still excessive and also asserting that the assessment was discriminatory due to the lower valuations attributed to neighboring properties in the city's central west end. *Id.* at 694-695.

Ultimately, the Supreme Court of Missouri agreed with the STC assessment decision, holding that the city's BOE revised $450 valuation was supported by competent and substantial evidence upon the whole record. *Id.* at 698. In other words, the revised assessment was the proper measurement, based on the city BOE's reduced property valuation. *Id.* at 694–698. In contrast to *Mid-America*, *Ulman* requires that the revised *Assessed Value* following any BOE valuation adjustment shall be used to calculate the *Level of Assessment*. *Id.* at 694.

Considering their evaluation following the 2007 reassessment and as memorialized in *Mid-America*, the STC is now shifting its position on the applicable valuation determination. 481 S.W.3d at 572-573. In *Mid-America*, the STC argued that the Assessor's valuation must be used when determining the actual *Level of Assessment*, but today the STC contends that any revised FMV as decided by the BOE and STC is the preferred method of evaluating a discrimination claim. *Id*. Accordingly, the *Mid-America* court affirmed the STC decision to utilize the Assessor's *Assessed Value* for the discrimination analysis. *Id*. at 579.

Considering this previous holding, Taxpayers understandably assert that any outcome affecting this matter must acknowledge the *Mid-America* decision, where the court indicates that the Assessor's valuation is preferred. *Id.* at 574. Before addressing *Mid-America* directly, we consult the applicable statutes, which seemingly reinforce the concept that the BOE and STC

12

decisions are the most relevant for calculating tax liability. Among the pertinent language, it reads:

> The county board of equalization shall, in a summary way, determine all appeals from the valuation of property made by the assessor, and shall correct and adjust the assessment accordingly . . . Section 138.060.1.

> The county clerk shall keep an accurate record of the proceedings and orders of the board, and the assessor shall correct all erroneous assessments, and the clerk shall adjust the tax book according to the orders of such board and the orders of the state tax commission . . . Section 138.060.2.

Following the appeal process, the revised numbers replace the assessor's figures pursuant to the statute. Section 138.060.1 and .2. Taxpayers argue that the Assessor's FMV determinations are the applicable measurement but this position seems to conflict with the plain, ordinary language of the statute. Any valuation revisions are memorialized moving forward and are equally necessary to correct erroneous assessments. Section 138.060.1 and .2. Significantly, the statute outlines a reasonably straightforward process where any valuation revision automatically triggers an assessment adjustment.

Initially, the BOE is empowered to correct and adjust any assessment following an appeal process. Section 138.060.1. When indicating the necessity to update any changes to the property valuation or FMV during the appeal process, the assessor "shall correct all erroneous assessments" and the clerk "shall adjust the tax book." Section 138.060.2. Further reinforcing the statutory theme that public officials shall utilize the updated, most current valuation to revise a property assessment, the statutory language directs the county clerk to record board orders during the appeal process. Section 138.060.2. Noticeably, the General Assembly removes any discretion from the hands of taxing authorities and uses uncompromising language. Specifically, the taxing authorities "shall" adjust the assessment following a corrected valuation and the clerk "shall"

13

accurately record the corrected assessments ordered by both the BOE and STC.[7] Applying the statute, we conclude that the legislature intended for any adjusted assessments as the applicable measurement for tax liability in deciding these claims.

Taxpayers point to the long shadow of *Mid-America* that extends deeply into the assessment analysis when asserting the assessor's figures are utilized for evaluating the discrimination claims. We acknowledge the *Mid-America* court's valuable and keen analysis of this process but we now conclude that the hearing officer evaluating that discriminatory claim misapplied the assessment information.

The *Mid-America* court concluded that the hearing officer calculated a 42% level of assessment after most likely dividing Assessor's *Assessed Value* of $467,450 by the BOE revised FMV of $1,122,000. 481 S.W.3d at 573. If in fact this is how the hearing officer calculated the 42% *Level of Assessment* for the subject property, this would be incorrect. Instead, the hearing officer should have divided the revised *Assessed Value* - not Assessor's *Assessed Value* of $467,450 - by the revised FMV to comply with the statute. After hearing an appeal and adjusting the valuation or FMV, the taxing authority "shall correct and adjust the assessment." Section 138.060.1. The *Mid-America* hearing officer started down the trail to correctly determine the subject property's *Level of Assessment* when initially inserting the revised valuation or FMV but strayed away when inserting the Assessor's *Assessed Value* instead of the more applicable, statutorily required revised *Assessed Value*. 481 S.W.3d at 573. To clarify, we disagree that Assessor's figures are used following any FMV revisions occurring in the appeal process. Any

---

[7] The statute refers to "assessment revisions" as well as appeals affecting "the valuation of property." Section 138.060.1 and .2. As previously discussed, the *Level of Assessment* is determined by a formula, specifically dividing the *Assessed Value* by the FMV which is more simply reduced as follows: *Assessed Value* ÷ FMV = *Level of Assessment*. Any revision to the property valuation (FMV) affects the *Assessed Value* which affects the *Level of Assessment*. The statute is unambiguous because it directs taxing officials to adjust the assessment according to any valuation revisions. Section 138.060.1

FMV revision by the BOE or STC also affects the *Assessed Value*, leaving these revised figures as the applicable measurements to analyze a discrimination claim.

*Ulman* seems more consistent with the legislative intent enunciated in Section 138.060 et al. and this case law remains controlling. Equally notable and contributing to our ultimate conclusion, the Supreme Court of Missouri has not held that the assessor's *Assessed Value* or valuation is the appropriate measurement for determining the actual *Level of Assessment* after a reviewing authority adjusts the FMV during the appeal process. When finding that the property owners failed to show discrimination in *Ulman*, the Supreme Court of Missouri affirmed the STC decision as supported by competent and substantial evidence. 247 S.W.2d at 698. The BOE 'equalized' the assessment or revised the property's *Assessed Value* after reducing the valuation. *Id*. at 698. To be clear, the *Ulman* court endorsed the reviewing authority revising the *Assessed Value* after adjusting the property's FMV, which is consistent with the statutory direction we must apply. Section 138.060.1 and .2. Contrary to Taxpayers' claim in this matter that courts are obliged to consider the Assessor's assessment when conducting the discrimination analysis, the Court held that "the action of the board of equalization in reducing the value of plaintiff's lot may have obviated the alleged discrimination of which plaintiff complains." *Id.* at 697.

Taxpayers will invariably argue that our decision to utilize the revised figures at the expense of Assessor's original valuation undermines the integrity of their discrimination claim, and impairs any discrimination claim, but the statute directs this approach. Section 138.060.1 and .2. After considering Taxpayers' cogent arguments and more specified, enumerated criticisms, we agree that Assessor must embrace open, transparent and balanced policies when calculating assessments. Recognizing the importance of a thorough, comprehensive and complete review process, the General Assembly specifies that under this process "[t]here shall be no presumption

that the assessor's valuation is correct." Section 138.060.1. But when and if he strays from an equitable approach, the statute empowers reviewing authorities like the BOE and STC to more promptly correct these ills. Besides the statutory consideration, our decision is consistent with the message conveyed in *Ulman* where the Supreme Court of Missouri explains the reviewing body with the taxing expertise can effectively consider, weigh and correct potential discrimination claims. 247 S.W.2d at 697. In fact, the BOE and STC have the ability to more promptly "obviate[] the alleged discrimination" while satisfying due process guarantees. *Id*.

### The STC's determination that the common level of assessment was between 30% and 30.5% was supported by competent and substantial evidence.

Following their review, the STC found the median appraisal level for commercial properties in St. Louis County during the 2017 assessment cycle was between 93.7% and 95.4% of FMV which translates to a median assessment level between 30% and 30.5%. The findings were supported by the ratio studies submitted by each expert witness after they analyzed a representative sample of properties and offered specific conclusions about the appraisals and the assessments.

Taxpayers argue that STC erred when adopting the "median" rather than the "weighted mean of central tendency" as the proper measure to calculate the common level of assessment. Taxpayers further assert that the weighted mean of central tendency is the preferred measure because it ensures equal protection guarantees and protects Taxpayers from a disproportionate share of the tax burden. We disagree. The STC's use of the median assessment level as the proper measurement for determining the common level of assessment is supported by competent and substantial evidence based on legal precedent, expert testimony and industry guidance.

In *Savage*, the Supreme Court of Missouri affirmed using the average level of assessment found in ratio studies for calculating evidence of disparity. 722 S.W.2d at 79. Additionally, the

STC consistently opines the median ratio should be used for identifying the common level of assessment when considering individual valuation adjustments. *See Foci Enterprise, LLC v. Zimmerman*, 2017 WL 3567945 \*9 (Mo. St. Tax Commission 2017) and *Industrial Development Authority of Kansas City v. Kelley,* 1989 WL 96234 (Mo. St. Tax Commission 1989). We find the STC correctly utilized the median as the proper measurement to determine the common level of assessment.

***The STC correctly concluded that evidence of sales chasing was not practically significant and rightly used the median as the proper measuring device to determine the difference between sold and unsold properties in the sales chasing analysis.***

Sales chasing or selective reappraisal occurs when sold and unsold properties are appraised differently or when the Assessor assigns a value to the sold property based on the sales price instead of identifying a value following normal assessment procedures. An analysis of sales chasing utilizes ratio studies to determine if the common level of assessment is unreliable. An expert compares the change in value of sold properties to unsold properties. This comparison assists with determining whether the impact of sales chasing contaminated the information gathering process, warranting a new ratio study. The International Association of Assessing Officers (IAAO) standards require that the level of sales chasing must be "practically significant" to require corrective action, such as conducting a new ratio study. However, the IAAO standards further suggest some reasonable tolerance in the percent change between sold and unsold properties when determining if the sales chasing is practically significant.

Applying the results from his ratio study, Myers testified the value of sold properties was 3.38% higher than the value of unsold properties but this percentage fell within his adopted 5% tolerance level, allowing him to conclude that the sales chasing was not practically significant. Conversely, Taxpayers' expert calculated a value change in sold properties at 3.93% higher than

17

that of unsold properties. Accordingly, Gloudemans further concluded that limiting the tolerance level to a 3% change was more appropriate. Also, unlike Assessor's expert, Gloudemans determined that the sales chasing was at a practically significant level, requiring corrective action and warranting a new sales ratio study. When conducting a new study, Gloudemans relied on the more dated information from Assessor's 2016 valuations and based on the 2015 reassessment.

While recognizing the disruptive impact of sales chasing and how it can unfairly alter Taxpayers' burden, we must acknowledge the existing law guiding our analysis of the assessment process. Our review is limited to determining if the STC decision is supported by competent and substantial evidence and we resist substituting our opinion for the expertise of the Commission. *Savage*, 722 S.W.2d at 75 (citing *Pierre Chouteau Condominiums v. State Tax Com'n*, 662 S.W.2d 513, 517 (Mo. banc 1984)).

Taxpayers argue the STC should reject Myers' opinion and embrace Gloudemans' assessment that the IAAO standards require a 3% tolerance level, the *mean* should be utilized for this calculation, not the *median* as advocated by Myers, the volume of sales chasing abrogates the experts' 2017 ratio studies and effectively necessitates Gloudemans' alternative study. While Taxpayers make compelling arguments and we recognize the enormity of their tax burden, the question is not whether their argument is supported by the evidence, the question is whether the STC decision is supported by substantial and competent evidence. *Bateman*, 391 S.W.3d at 444. We find it is.

Following their review, the STC found Myers' 5% tolerance level was reasonable, the level of sales chasing was not practically significant and an alternative sales ratio study was unnecessary. The Supreme Court of Missouri instructs that the proper method for valuing and assessing property is delegated to the Commission. *Savage*, 722 S.W.2d at 75 (citing *C & D*

18

*Investment Co. v. Bestor*, 624 S.W.2d 835, 838 (Mo. banc 1981)). Taxpayers argue that the IAAO guidelines more fully embrace Gloudemans findings, supporting his conclusion that the amount of sales chasing reached a practically significant level and necessitated a new ratio study. More specifically, Taxpayers contend the 2017 reassessment was critically flawed because the Assessor failed to follow the certified Assessment Maintenance Plan and IAAO standards, his review appraisers manually adjusted individual property assessments and relied on invalid sales data.

Although Myers concedes that the *IAAO Standard on Ratio Studie*s clarifies that the threshold for practical significance should be less than 8% and cites 3% as an example of an appropriate level, the 3% threshold is not the standard in all cases. Besides, Assessor points out that even Taxpayers' expert admits that up to a 5% threshold is acceptable because Gloudemans specifically endorsed this approach when writing the authoritative IAAO textbook. Conceding this, but still advocating the necessity of a 3% threshold, Gloudemans distinguishes the 5% threshold as reserved for situations where sold properties are disproportionally located in growth areas or a scenario that is inapplicable to St. Louis County at the time of the 2017 reassessment.

When reviewing the STC decision, the court considers the evidence in light most favorable to the STC determination and if the evidence supports either of two opposing findings we are bound by the administrative decision. *Hermel, Inc. v. State Tax Com'n*, 564 S.W.2d 888, 894 (Mo. banc 1978). Ultimately, the STC found Myers more persuasive in the battle of experts and we find their decision is supported by the evidence. When examining the distribution of unsold commercial properties between 2015 and 2017, he cited specific data reflecting the significant changes in property values during this time period and justifying the STC decision to use the 5% tolerance threshold as he advocates.

Even Myers agrees there are indications of selective reappraisal in Assessor's 2017 reassessment but this does not mean that these indicators rise to the level of practical significance or require corrective action in this matter as advocated by Taxpayers. On balance, he recognizes that corrective action "can come at a cost with… drawbacks." After determining the 2017 reassessment was flawed when exceeding the 3% tolerance level, Gloudemans chose the corrective action of utilizing the 2016 valuation, which is based on the more dated 2015 reassessment. Besides using more dated information, Gloudemans' action means that he is not utilizing the 2017 reassessment, which is the basis of Taxpayers' appeal.

Next, Taxpayers argue that Myers and the STC erroneously chose to use the *median*, rather than the *mean*, as the preferred measuring device to determine the difference between sold and unsold properties in the sales chasing analysis. Since the IAAO utilizes the term "average," Taxpayers argue Gloudemans *mean* is the preferred method of calculation rather than Myers' *median*. This argument lacks merit. In fact, the IAAO standards refer to the term "average," but using the median percent change in the sales chasing analysis is acceptable, as reinforced by the IAAO reference to the Mann-Whitney test.[8] Further justifying his preference, Myers testified that he used the *median* method of measurement to protect against distortions due to large value percent changes among unsold properties.

Regardless, Myers concludes that the outcome is similar whichever measurement is utilized. More specifically, he reanalyzed the properties using the *mean* method of measurement, as preferred by Gloudemans, and concluded a less than 5% difference between sold and unsold

---

[8] The IAAO cites the Mann-Whitney test as offering an appropriate sales chasing analysis which uses Myers' preferred *median* measurement to compare the values of sold and unsold properties.

properties.[9] Again, we are not choosing between expert opinions. *Hermel, Inc.*, 564 S.W.2d at 894. More simply, we are reviewing if there was substantial and competent evidence supporting the STC conclusion involving the sales chasing analysis. We find that there is.

### *The STC correctly concluded that any evidence of Regressivity did not require corrective action and properly applied the median rather than the value weighted mean as the common level of assessment.*

Further, Taxpayers allege that an unacceptable level of regressivity taints the 2017 property assessments. A reviewing court cannot substitute its judgment for that of the agency and must also defer to the agency's findings regarding the weight of the evidence and witness credibility. *Conley v. City of St. Louis*, 561 S.W.3d 848, 853 (Mo. App. E.D. 2018) (citing *Missouri Veterans Home v. Brown*, 374 S.W.3d 359, 364 (Mo. App. W.D. 2012)). Regressivity occurs where low-value properties are assessed at a higher percentage of FMV than high-value properties, triggering a higher tax burden for the low-value property owners which is discriminatory. While the Assessor concedes that there is some regressivity in the 2017 reassessment, the level does not fail under IAAO standards pursuant to either the 2016 ratio study performed by Gloudemans or the 2017 ratio study done by Myers. The IAAO standards indicate the Price Related Bias (PRB) should generally fall between -0.05 and 0.05, but ranges within -0.10 and 0.10 are generally acceptable.

When finding regressivity was within reasonable and acceptable levels, the STC again weighed the testimony of the expert witnesses and considered IAAO standards. Here, the IAAO and both experts recognize the Price Related Bias (PRB) as the optimal method to test for regressivity. Following his analysis, Myers calculated a PRB of -0.032. Conversely, Gloudemans

---

[9] After applying the *mean* method of measurement, Myers calculated the sold properties at 7.519% and the unsold properties at 3.111%, a difference of 4.408 but still under the 5% threshold of practical significance as concluded by Myers.

21

calculated a PRB of -0.063 in his initial ratio study. Arguing his initial ratio study reflected excessive regressivity, Gloudemans conducted a subsequent ratio study resulting in a PRB of -0.104, reflecting an even more extreme level of regressivity. Considering Myers completed PRB calculations falling within the acceptable range of IAAO standards and even Gloudemans formulated at least one of two PRB calculations falling within generally acceptable standards, the STC rightly determined that Taxpayers did not meet their burden or persuasively demonstrate that any existing regressivity reached a level warranting corrective action.

Following a review of the evidentiary record, the STC did not improperly ignore the existing regressivity and there was substantial and competent evidence supporting the STC conclusion that the level of regressivity was within reasonable and acceptable levels.

***The STC properly compared the actual level of assessment with the common level of assessment and the STC's decision that the disparity is not grossly excessive is supported by competent and substantial evidence.***

After finding the evidentiary record supports the STC decision identifying the common level of assessment, we next review the comparison of taxpayer's actual *Level of Assessment* with the common level of assessment. *Savage*, 722 S.W.2d at 74. Here, the STC confirmed the actual *Level of Assessment* was 32% and the median level of assessment (or common level of assessment) was between 30% and 30.5%, corresponding to the figures calculated by the respective expert witnesses. When comparing the actual *Level of Assessment* to the median or collective level of assessment, the STC determined a disparity of 6.3% to 4.6% is not so grossly excessive as to be inconsistent with an honest exercise of judgment. *Id.* at 78.

There is not a bright-line test to determine if the disparity between the actual *Level of Assessment* and the median or common level of assessment is grossly excessive. *Mid-America*, 481 S.W.3d at 575. The Supreme Court of Missouri held a disparity of 59% was grossly

22

excessive. *Savage*, 722 S.W.2d at 79. The STC found disparities from 3% to 14% are not grossly excessive. *See Foci Enterprise, LLC v. Zimmerman*, Appeal No. 15-10103 (Mo. St. Tax Commission April 3, 2018) (3% disparity not grossly excessive) and *West County BMW v. Muehlheausler*, 2009 WL 752505 *8 (Mo. St. Tax Commission 2009) (14% disparity not grossly excessive). Applying Missouri law, the STC's finding that a 4.6% to 6.3% disparity is not grossly excessive is likewise supported by competent and substantial evidence. Points I-III are denied.

## Point IV

Next, Taxpayers contend the hearing officer and the STC erred when quashing the subpoenas for depositions directed to the Assessor and several review appraisers. Further, they assert error after the hearing officer denied them an opportunity to conduct meaningful discovery into the Assessor's Independent Appraisal System (IAS) and additional assessment practices. These arguments lack merit.

### Standard of Review

Trial courts and the STC have broad discretion over the discovery process. *Daly v. State Tax Comm'n*, 120 S.W.3d 262, 267 (Mo. App. E.D. 2003). Appellate courts will not interfere with those decisions absent a clear showing of abuse of discretion. *Id*.; *Hancock v. Shook*, 100 S.W.3d 786, 795 (Mo. banc 2003). An abuse of discretion occurs when a ruling is clearly against the logic of the circumstances before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful and deliberate consideration. *Daly*, 120 S.W.3d at 267; *Cox v. Kansas City Chiefs Football Club, Inc.*, 473 S.W.3d 107, 114 (Mo. banc 2015).

After Taxpayers filed their appeal with STC in October 2017, the hearing officer in this matter promptly entered a scheduling order outlining the applicable discovery deadlines. After the Taxpayers requested an extension to allow their expert witness "sufficient time to review highly relevant data" relating to the St. Louis County assessment roll and other information, the hearing officer amended the schedule and extended the exhibit deadline over Assessor's objection on July 31, 2018.[10] Shortly thereafter, Taxpayers served a subpoena on Assessor, and two senior Assessor employees, Sandy Youtzy and John Gillick,[11] instructing them to appear for deposition. In his 'Motion to Quash,' Assessor argues Taxpayers' intent is to obtain the same information that was previously raised in Taxpayers' previously argued Motion to Compel when pursuing these depositions; Taxpayers belatedly waited to pursue discovery from fact witnesses until after the written direct testimony deadline under the pre-amended scheduling order and the hearing officer should block Assessor's deposition specifically because Taxpayers failed to demonstrate that they could not obtain this information from other sources within the office.

Following the review, the hearing officer granted the Motion to Quash regarding Assessor but denied it regarding Youtzy and Gillick. When prohibiting Assessor's deposition, the hearing officer agreed with Assessor that Taxpayers may not unnecessarily disadvantage Assessor with a deposition unless it can show that he has relevant information that cannot be acquired from other sources within his office, such as the senior staff capable of explaining the review and assessment process. *Ford Motor Co. v. Messina*, 71 S.W.3d 602, 606 (Mo. banc 2002) (citing *Fogelbach v. Dir. of Revenue*, 731 S.W.2d 512, 513 (Mo. App. E.D. 1987)).

---

[10] In his "Response in Opposition to (Taxpayers') Motion to Amend the Scheduling Order," Assessor argues that Taxpayers waited seven months before initiating discovery and altering the scheduling order would prejudice Assessor because it would reduce his rebuttal period.

[11] Originally, Taxpayers served the subpoena for deposition on Sarah Siegel but later substituted her for Gillick.

Following a similar review, the hearing officer also denied the deposition requests for the eleven additional appraisers. Taxpayers' delayed action contributed to this outcome. After discovering their identity at some point earlier in the discovery process, Taxpayers waited until only a short time before the evidentiary hearing to pursue the depositions of these individuals. While the reasons affecting the hearing officer's decision-making may differ for any particular ruling, the collective record reflects that she made these decisions following thoughtful consideration.

Taxpayers also assert that they were denied access to other information available through IAS, similar to Assessor's computer assisted mass appraisal system CAMA, and they were denied an opportunity to conduct meaningful discovery. Trial courts and the STC have broad discretion over the discovery process and appellate courts will not interfere with those decisions unless showing an abuse of discretion. *Daly*, 120 S.W.3d at 267.

The hearing officer entered a clear, unambiguous scheduling order after both sides provided input. Notably, the record demonstrates substantial discovery occurred over several months while the parties prepared, exchanged and submitted written testimony and numerous exhibits. Further, the STC considered numerous written motions regarding these requests while also frequently allowing the parties to orally present their discovery arguments as well. The record shows the hearing officer and the STC carefully considered the discovery requests, specifically weighing the delay versus the potential for gaining relevant and useful information. We conclude Taxpayers fail to demonstrate that these discovery rulings were an abuse of discretion. *Daly*, 120 S.W.3d at 262; *Hancock*, 100 S.W.3d at 786. Point IV is denied.

## Conclusion

Following our review, we reverse the trial court and hold that the STC decision finding that Taxpayers failed to prove their discrimination claims is based on substantial and competent evidence. Likewise, we conclude the STC did not abuse their discretion during the discovery process. Pursuant to Rule 84.14, we reinstate the STC order.

_____
Thomas C. Clark II, Judge

Kurt S. Odenwald, P. J., and Kelly C. Broniec, J., concur.