247 S.W.2d 693 (1952)
ULMAN
v.
EVANS et al.
No. 42717.
Supreme Court of Missouri, Division No. 1.
March 10, 1952.
Rehearing Denied April 14, 1952.
Wilton D. Chapman, St. Louis, for appellant.
J. E. Taylor, Atty. Gen., James W. Faris, Asst. Atty. Gen., for respondents.
James E. Crowe, City Counselor, Charles J. Dolan, Associate City Counselor, St. Louis, for respondents Sestric and Bannister.
LOZIER, Commissioner.
Plaintiff-appellant, owner of real estate in the City of St. Louis, challenged the city's real property tax assessment for 1950. Defendants-respondents are the members of the state tax commission and the city assessor and city collector. The commission *694 sustained the assessment and upon review the circuit court dismissed plaintiff's petition. Plaintiff appealed.
The issue is the propriety of the commission's ruling affirming the assessment based upon the valuation of plaintiff's lot as equalized by the city board of equalization. It was the duty of the trial court, as it is ours on appeal, with proper deference to findings involving credibility of witnesses, to determine whether the commission "could have reasonably made its findings, and reached its result, upon consideration of all of the evidence before it; and to set aside decisions clearly contrary to the overwhelming weight of the evidence." Wood v. Wagner Electric Corporation, 355 Mo. 670, 197 S.W.2d 647, 649.
As will appear, the city's real property tax is assessed upon the basis of two separate valuationsthat of the lot and that of the building. The valuation of the building on plaintiff's lot is not in dispute. An initial land valuation of plaintiff's lot, $650 per front foot, was made by the city assessor. This was reduced to $450 by the city board of equalization. Plaintiff appealed to the commission from the revised assessment based upon the equalized valuation. After a hearing, the commission affirmed the assessment, finding that the equalized valuation was the "true value" of the lot. Art. X, Sec. 14, 1945 Const., V.A.M.S.; RSMo 1949, Secs. 138.430 and 138.470, V. A.M.S. (Unless otherwise indicated, subsequent statutory references are to both RSMo 1949 and V.A.M.S.)
Plaintiff filed in the circuit court a petition for review to which she attached as exhibits, and in which she incorporated by reference, the transcript of the proceedings before the commission. Art. V, Sec. 22; Secs. 536.100, 536.110 and 536.130. The defendants-city officials filed a motion for judgment on the pleadings, which, apparently, was not ruled. Thereafter, the circuit court, upon defendants' motions, dismissed the petition for failure to state a claim upon which relief could be granted. We construe, as do the parties, the dismissal order as a judgment affirming the commission's findings, ruling and order. See Sec. 536.140, subd. 5.
Plaintiff makes two assignments, viz.: "The record shows conclusively that appellant's lot was assessed at more than its true and actual value"; and "the assessment was illegal and discriminatory, as compared with the assessments of other lots adjoining and in the near vicinity, and so unequal, unwarranted, capricious and arbitrary as to amount to fraud in law."
The assessment was made under Secs. 72-88, Chap. 23, Rev.Code of St. Louis. These provisions are hereinafter referred to as the ordinance or as Ordinance No. 39490. Its purposes, as recited in its title as originally enacted in 1932, are the establishment of "the true value in money" of and "a fair and impartial value on each parcel of real estate" in the city "as a basis for a fair and equitable tax assessment," requiring "the application of careful, exact, scientific principles and rules." It provides for the determination of the "true value" of real estate (based upon separate valuations of the building and the land itself) measured by a "uniform standard unit value * * * designated as the standard unit foot and which shall be a strip of land one foot wide and 125 feet deep or such other depth or depths as shall be finally agreed upon and adopted."
The value of each lot in a block is based upon the value of a strip one front foot in the middle of the block by 125 feet deep. The assessor is directed to establish formulas for determining the front foot values of lots of various depths. Rules for computing values, including those of such an irregularly shaped lot as plaintiff's, are set out in detail. The other factors to be considered as "enhancing or detracting elements affecting value" are lot depth and corner, railway, sidestreet and alley locations. The assessor's formulas must reflect the effect of these other factors, and he must classify buildings or structures by type of construction and use. Under the formulas established by the assessor, the front foot value of an entire lot is determined by the square foot rental value of the building's ground floor space.
Plaintiff's lot is on the south side of Maryland Avenue in the first block east of Kingshighway. It is irregular in shape, *695 fronts 174.17 feet on Maryland, is 94.75 feet deep, and its south line is 161 feet long. The frontage of the building, the Medical Arts Building, is 120 feet. This three-story building consists of six ground floor stores, each with a finished basement, and offices on the two upper floors. The building is 50 to 54 feet deep, according to the scale shown on plaintiff's plat. A driveway around the building is 50 feet wide on the west side of the building and 15 or 16 feet wide on the east side, according to such scale.
In the same block and on the same side of Maryland, abutting plaintiff's lot on the west is the Park Plaza Garage lot with 60 feet frontage; and west of that lot is the Park Plaza Hotel lot, fronting 140 feet on Maryland and 217 feet on Kingshighway. Abutting plaintiff's lot on the east is the Sperber lot with 50 feet frontage; and east of that lot is the Lockhart lot with 160 feet frontage on Maryland and approximately 100 feet frontage on York Ave., the first street east of Kingshighway. Retail store buildings are on the Sperber and Lockhart lots. The Sperber and Lockhart lots have the same depth as plaintiff's; the Hotel and Garage lots are deeper. There is no alley to the rear (south) of any of these lots. The Chase Hotel Garage lot, fronting on York, is south of the Ulman (plaintiff), Sperber and Lockhart lots. Euclid Avenue is the first street east of York. This general area is later referred to as part or as the west part of the Maryland-Euclid commercial retail district. The lots on the south side of Maryland between Kingshighway and Euclid are also referred to as a part of that district.
Plaintiff's only witness was Mr. Chase Ulman who qualified himself as "an expert on lot values in the west end of St. Louis." His relationship, if any, to plaintiff, Maria C. Ulman, does not appear. His testimony strongly suggests that he still has some interest in the lot which he once owned and which he had sold in 1933, as a vacant lot, to a corporation of which he was the principal owner. He built the Medical Arts Building in 1939. He conceded that while "I am supposed to be an expert, I might be prejudiced." The commission frankly told him that his testimony was weakened "because you are an interested party."
Mr. Ulman first expressed his opinion that $52,270 or $300 per front foot (the land valuation for the 1949 assessment) was fair. He said that, with two possible exceptions, the shops in the Maryland-Euclid district are self operated by small owners; that the district has reached its peak; and that the business development of the Clayton, St. Louis County, district was prejudicial to the Maryland-Euclid district.
The effect of Mr. Ulman's testimony was to reduce plaintiff's complaint to one of discrimination because of the lower valuations of "these other properties all around me," especially the Hotel and the Garage lots. He compared the latter to plaintiff's lot as to sale prices (to purchasers as vacant lots many years before) and as to total assessments for land and assessments per lot front footage and per square footage. (He did not, however, compare these assessments as to building-ground-floor-space-square-footage or as to ground floor rentals.) He made similar comparisons between plaintiff's lot and lots in other commercial retail districts, other than "downtown", in the city, and the Famous-Barr and Forsythe Plaza lots in Clayton, several miles outside the city limits. While he thought that that part of Maryland Ave. was "on the decline as a business district, primarily due to the development at Clayton," it is still a "high class ladies wear district"; and the Portland and Westmoreland places in the vicinity were regarded as "the highest class residential streets in St. Louis." He thought that the value of plaintiff's lot was adversely affected because it was an inside, not a corner, lot and portions of it had to be used for driveways.
Mr. Fred W. Kuenstler, district deputy assessor, testified for the city. He read into the record a report which he had made for the assessor's use at the commission hearing. Applicable portions were: since 1947, the assessor's office had reviewed and revalued lots in every commercial retail district except in a few minor localities; the more important such districts, other than "downtown", are: the Grand-Olive, the *696 Cherokee (between Jefferson and California), the Wellston, the Kingshighway-Delmar, the Gravois-Delor, the South Broadway, the North 14th (between St. Louis and Benton), the Euclid-McPherson, and the Maryland-Euclid district is one of the best "speciality shop retail locations in the city and probably the best `uptown' location for high class speciality shops" and the rentals in that district are exceeded only in locations in the Grand-Olive-Washington area and in the better locations in the "downtown" district.
Mr. Kuenstler stated that all land values had been computed in accordance with the ordinance, "which sets forth in detail the methods to be used and the tables that must be set up to execute its provisions. These tables are adopted from recognized research authorities, and the front foot value for a standard depth lot is based upon a 6% return * * *. Locations for retail commercial stores are the highest and best use to which land can be put. This is the reason for the `downtown' section having the highest land values. Ground stores can only pay rent in proportion to the amount of business they can do in any location and make a profit, and are always willing to pay a higher rent where they can draw more business. The gross sales percentage leases now being made in many locations are a verification of this principle. Land values in commercial districts are based upon ground floor store rentals which is the only sound method of computing commercial ground values and is a recognized appraisal procedure everywhere."
Mr. Kuentsler then set out the average- monthly-rental-per-square-foot-of-ground floor-space for the city's commercial retail districts, except "downtown." For the west part of the Maryland-Euclid district (which includes plaintiff's lot) the figures were 25¢ to 27¢, and for the east part, 14¢ to 17¢. The figures for the other districts varied from 14½¢ to 18¢ (North 14th) to 14½¢ to 33¢ (east part, Grand-Lindell-Delmar). "The per front foot values evidenced by these rentals were placed on the books, varied for depth and shape of lots * * *".
Mr. Kuenstler submitted his detailed computations as to the valuations of certain lots in part of the Maryland-Euclid district, viz., all on the south side of Maryland between York Ave. and the west line of plaintiff's lot except the east 62 feet of the Lockhart lot. The frontage of this particular area or subdistrict, as we shall call it, was 322 feet. Under the formulas, the front foot value of a "standard" lot 125 feet deep was $750. The value of plaintiff's lot, 94.75 feet deep, was $650 per front foot. Mr. Kuentsler made similar analyses of the values of other lots in the Maryland-Euclid district other than those in this subdistrict. While he did not give his detailed computations as to the Hotel and Garage lots (and plaintiff did not cross-examine him as to the matter), it was not disputed that the values of those lots were established under the assessor's formulas. According to Mr. Kuenstler, the value of plaintiff's lot "cannot be compared to, nor does it have any relation whatever to the value of ground, even in the immediate vicinity, used for residential or multi-family purposes."
Mr. Ulman criticised Mr. Kuenstler's computations as to the subdistrict valuations. He said that some of the rentals had been estimated, that others, as in plaintiff's case, included use of basements and that still others included free parking space. Plaintiff neither offered other evidence as to these matters nor cross-examined Mr. Kuenstler concerning them. Mr. Ulman also said that in one instance, not involving plaintiff's property, the monthly rental had been figured at $1,000 instead of $500. Mr. Kuenstler testified to the contrary and, again, plaintiff offered no other evidence in support of Mr. Ulman's statement.
Returning to plaintiff's first contention that her lot was assessed at more than its true value. This is based upon the testimony of Mr. Ulman. Even according great weight to Mr. Ulman's expert opinion as to values, his opinion is primarily based upon factors other than those prescribed in the ordinance. Too, his opinion as plaintiff concedes in her brief, is contradicted by the testimony of Mr. Kuenstler. *697 The evidence persuasively sustains the commission's ruling that the valuation, as equalized by the board, "was the true value."
Plaintiff's other contention is that an unlawful, arbitrary and discriminatory valuation is shown by the lower assessments against the Hotel and Garage lots. The assessment against the Garage lot, fronting only on Maryland, was $100 less, $350 per front foot. The only evidence as to the Hotel lot, at the corner of Kingshighway and Maryland, after "deducting 50 feet for corner," showed a valuation averaging $300 per front foot on both streets. However, plaintiff failed to show that these valuations, which on casual observation might seem to have been unlawful, arbitrary and discriminatory, were unlawful, arbitrary or discriminatory in fact. She offered no evidence tending to prove that the initial assessments against the Hotel and Garage lots, as shown in the record, were the result of deliberate, intentional undervaluation. And, had there been any evidence suggesting that the assessor deliberately undervalued the other two lot and overvalued plaintiff's, the action of the board of equalization in reducing the value of plaintiff's lot may have obviated the alleged discrimination of which plaintiff complains.
Plaintiff does not claim that the other two lots were not assessed under the same formulas as was hers. There was no evidence as to the values of the Hotel lot's corner frontages (50 feet each on Kingshighway and Maryland), or of its other 167 feet on Kingshighway or its other 90 feet on Maryland. The other two lots differed from plaintiff's in size and shape, in size, type and use of building, and, in all probability, in building ground floor space rentals. There was no evidence as to either such space or such rentals. (Mr. Ulman did make a rough guess as to the annual income and expenses of the operators of the Park Plaza Garage and the Chase Garage; and stated that their gross rentals were more than plaintiff's gross rentals. He also estimated that both the gross and net income from each of these two garage properties exceeded plaintiff's gross and net income from the Medical Arts Building. But he made no comparisons as to either ground floor space or rentals.)
As stated, the city board of equalization lowered the valuation of plaintiff's lot from $650 to $450 per front foot. As the transcript of the hearing before the board is not a part of the instant record, we do not know what plaintiff's evidence was or upon what basis the board reduced the valuation. (We may assume that plaintiff urged and the board considered the same reasons that she urged before the commission, the circuit court and this court.) In any event, the board "equalized" plaintiff's assessment by reducing the valuation of her lot.
Plaintiff contends that such "equalized" valuation was so unreasonable and excessive as to be fraudulent in law, citing Boonville Nat. Bank v. Schlotzhauer, 317 Mo. 1298, 298 S.W. 732, 55 A.L.R. 489, and Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 38 S.Ct. 495, 62 L.Ed. 1154. But she failed to furnish any evidence that the valuation was "so grossly excessive as to be entirely inconsistent with an honest exercise of judgment." St. Louis Electric Bridge Co. v. Koeln, 315 Mo. 424, 287 S.W. 427, 429. There was no evidence whatsoeverand, indeed, plaintiff does not claimthat the Hotel and Garage lots were intentionally valued at less than their "true value" or as a result of a systematic undervaluation of property generally; or that other comparable lots were deliberately undervalued. See Boonville Nat. Bank v. Schlotzhauer, supra; Jefferson City Bridge & Transit Co. v. Blaser, 318 Mo. 373, 300 S.W. 778.
"There is no such thing as an absolute true value of land. The `values' mentioned in the statutes are the valuations of the officials whose duty it is to make them. Land is not like commodities which have a fixed market price at a given period. Its value is determined always by the estimate of the party who values it." State ex rel. Thompson v. Bethards, 320 Mo. 1164, 9 S.W.2d 603, 604. "All presumptions are in favor of the correctness of tax assessments. The good faith of tax assessors and the validity of their actions *698 are presumed." 51 Am.Jur., Taxation, Sec. 655, p. 620. See also Wymore v. Markway, 338 Mo. 46, 89 S.W.2d 9, 11; State ex rel. Jamison v. St. Louis-San Francisco Ry. Co., 318 Mo. 285, 300 S.W. 274, 277.
We hold that the commission's affirmance of the instant assessment, based upon the valuation fixed by the board of equalization, is supported by competent and substantial evidence upon the whole record, is clearly not contrary to the overwhelming weight of the evidence, was authorized by law, and was neither arbitrary, capricious nor an abuse of discretion. Sec. 536.140, subd. 2.
The judgment is affirmed.
VAN OSDOL and COIL, CC., concur.
PER CURIAM.
The foregoing opinion by LOZIER, C., is adopted as the opinion of the court.
All concur.