

# SUPREME COURT OF MISSOURI
## en banc

CROWN DIVERSIFIED　　　　　　)　　　*Opinion issued February 14, 2024*
INDUSTRIES CORP., et al.,　　　)
　　　　　　　　　　　　　　　　)
　　　　　　Respondents,　　　　)
　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　)　　　No. SC100219
　　　　　　　　　　　　　　　　)
JAKE ZIMMERMAN, ASSESSOR,　　)
ST. LOUIS COUNTY, MISSOURI,　)
　　　　　　　　　　　　　　　　)
　　　　　　Appellant.　　　　　)

### APPEAL FROM THE CIRCUIT COURT OF ST. LOUIS COUNTY
### The Honorable Brian H. May, Judge

Jake Zimmerman, the St. Louis County Assessor ("Assessor"), appeals the circuit court's judgment reversing the decision and order of the Missouri State Tax Commission ("STC") and remanding the case for retrial on discrimination claims filed by Crown Diversified Industries, Corp., and other St. Louis County commercial property owners ("Taxpayers").[1]  The STC's decision and order denying Taxpayers' discrimination claims is authorized by law and supported by substantial and persuasive evidence.  The STC did not abuse its discretion by denying certain discovery requests and quashing subpoenas for

---

[1] This Court transferred the appeal following an opinion by the court of appeals and has jurisdiction pursuant to article V, section 10 of the Missouri Constitution.

the deposition of Assessor and several staff appraisers. The judgment is vacated, and the STC's decision and order is reinstated. Rule 84.14.

## Background

Taxpayers are 2,625 St. Louis County commercial property owners who allege Assessor assigned discriminatory assessments to their properties during the 2017 assessment. Taxpayers do not claim intentional discrimination. Instead, Taxpayers argue their properties were assessed at a greater percentage of fair market value (FMV) than other St. Louis County commercial properties, causing them to shoulder a disproportionate property tax burden. This is known as a "ratio discrimination" claim.

During the 2017 assessment, Assessor used a Computer Assisted Mass Appraisal ("CAMA") system to estimate the FMV of St. Louis County commercial properties. The CAMA system generated FMV estimates for individual properties by applying a mathematical formula to market data and individual property characteristics. Assessor's appraisal staff conducted a final review of all improved properties to determine whether the CAMA-generated FMV estimates required adjustment. After completing this process, Assessor multiplied the FMV by the statutory 32% assessment rate to calculate the assessed value for each property.[2] The tax bill for each property was calculated by multiplying the assessed value by the local tax rate.

A property owner may appeal the assessment to the local board of equalization ("BOE"). The BOE is required to "determine all appeals from the valuation of property

_____

[2] Assessor is required to assess commercial real property at 32% of its fair market value. Sections 137.115.1; 137.115.5(3). All statutory citations are to RSMo 2016, as supplemented.

made by the assessor, and shall correct and adjust the assessment accordingly."  Section 138.060.1.  A taxpayer may timely appeal the BOE decision to the STC, which is required to "correct any assessment or valuation which is shown to be unlawful, unfair, improper, arbitrary or capricious."  Section 138.430.1.  If the BOE or STC concludes an assessment is erroneous, the county clerk "shall adjust the tax book according to the orders of such board and the orders of the state tax commission[.]"  Section 138.060.2.

Taxpayers timely appealed their assessments to the BOE and the STC.  In 1,887 of the 2,625 appeals, the BOE and STC did not change Assessor's original FMV and assessed value.  In the remaining 738 appeals, the BOE or the STC ordered reductions in the estimated FMV of the property, resulting in a lower assessed value and decreased tax liability.

The STC hearing officer consolidated Taxpayers' discrimination claims and conducted a single evidentiary hearing.  To prove ratio discrimination, Taxpayers first had to prove the FMV of their properties, and then show they actually were assessed at a greater percentage of FMV than the common assessment level generally applied to St. Louis County commercial properties.  *State ex rel. Ashby Road Partners, LLC v. State Tax Comm'n*, 297 S.W.3d 80, 85 (Mo. banc 2009).  If the actual assessment level applied to a specific property is "grossly excessive" compared to the common assessment level, the assessment is discriminatory.  *Savage v. State Tax Comm'n of Mo.*, 722 S.W.2d 72, 78-79 (Mo. banc 1986).

To prove the FMV of their properties, Taxpayers relied on the BOE and STC decisions determining value.  The net result was that 1,887 Taxpayers asserted their

3

property's FMV was Assessor's original value, while the remaining 738 Taxpayers asserted the FMV was shown by the BOE or STC decisions reducing Assessor's values. Although the BOE and STC reduced the value and attendant tax liability for hundreds of properties, Taxpayers argued the actual assessment level for their properties must be based on Assessor's original assessed value, even though that value was no longer the basis of their tax liability. The STC rejected this argument, concluding that, by asserting the BOE and STC decisions proved the FMV of their properties, Taxpayers "therefore effectively concede their properties were actually assessed at the statutory rate of 32% of fair market value." The STC ultimately concluded "the actual assessment level establishing [Taxpayers'] actual tax liabilities was based on the values assigned" by the BOE or STC decisions, not on Assessor's discarded original assessed value.

To determine the common level of assessment, the parties retained expert witnesses to conduct ratio studies. Ratio studies determine the level and uniformity of assessment by comparing the assessor's values to the FMV of a representative sample of properties. The assessor's values are compared to the FMVs of the representative sample to draw statistical inferences about assessment performance, including the common assessment level. The common assessment level measures the overall percentage of FMV at which an entire class of property is assessed and typically is expressed as a median or as an average.[3]

---

[3] For instance, if the median FMV assigned by an assessor is 90% of the actual FMV, the common assessment level is calculated by multiplying the statutory assessment rate by the median 90% appraisal level, resulting in a common assessment level of 28.8% of FMV (0.90 x 0.32 = 0.288).

Taxpayers' expert, Robert Gloudemans, calculated a median appraisal level of 93.7%, resulting in a median common assessment level of 29.98% (0.937 x 0.32 = 0.2998). Assessor's expert, Josh Myers, calculated a median appraisal level of 95.4%, resulting in median common assessment level of 30.53% (0.945 x 0.32 = 0.3053). Both studies used Assessor's 2017 assessment data.

Gloudemans conducted a second ratio study because he concluded Assessor's 2017 assessment data was compromised by evidence of "sales chasing" and regressive assessments.[4] The second study used property values from the 2015 assessment adjusted upward to account for market appreciation and concluded the median 2017 assessment level was 88.8%, with a value-weighted mean of 78.4%. Myers testified the 2017 data was not compromised by sales chasing or regressivity.

The STC hearing officer found there was no substantial and persuasive evidence of discrimination. Taxpayers filed a joint application for review of the hearing officer's decision pursuant to § 138.432. The STC affirmed the hearing officer's decision and order. The STC found the 30.53% and 29.98% median common assessment levels calculated by the expert witnesses were not grossly excessive and discriminatory because they were only 4.6% and 6.3% below the 32% actual assessment level applied to Taxpayers' properties. The STC further found the hearing officer did not abuse her discretion by limiting discovery and precluding the deposition of Assessor and several staff appraisers.

_____

[4] Sales chasing is the selective reappraisal of recently sold properties to their sales prices instead of valuing them by the assessor's normal valuation methods. Assessments are regressive when lower value properties are assessed at a higher percentage of FMV compared to higher value properties. Both issues are addressed in more detail below.

5

Taxpayers filed a petition for judicial review pursuant to § 536.100. The circuit court entered a judgment reversing the STC's decision and order and remanding for retrial. Assessor appeals.

**Standard of Review**

This Court reviews the "action of the agency," not the circuit court's judgment. Section 536.140; *Armstrong-Trotwood, LLC v. State Tax Comm'n*, 516 S.W.3d 830, 835 (Mo. banc 2017). When, as in this case, the agency's final decision incorporates the hearing officer's decision, the decisions are reviewed together. *Tibbs v. Poplar Bluff Assocs. I, L.P.*, 411 S.W.3d 814, 820 (Mo. App. 2013).

This Court determines whether the STC's decision and order is "authorized by law" and "supported by competent and substantial evidence upon the whole record." Mo. Const. art. V, § 18. This Court defers to the STC's factual findings and reviews the agency's legal conclusions *de novo*. *Bateman v. Rinehart*, 391 S.W.3d 441, 445 (Mo. banc 2013); *see also* § 536.140.3 (providing the "application by the agency of the law to the facts" is reviewed *de novo*). The evidence is "considered in the light most favorable to the administrative body, together with all reasonable inferences which support it, and if the evidence would support either of two opposed findings, the reviewing court is bound by the administrative determination." *Savage*, 722 S.W.2d at 75. Absent an abuse of discretion, this Court is "loathe to substitute its judgment for the expertise of the Commission in matters of property tax assessment." *Id*.

6

**Discrimination**

The United States and Missouri constitutions prohibit the discriminatory assessment and taxation of similarly situated properties. *Savage*, 722 S.W.2d at 78. In the absence of intentional discrimination, an assessment may, nonetheless, be discriminatory if it "in effect amounts to an intentional violation of the essential principle of practical uniformity." *Id.* (emphasis omitted) (quoting *Sunday Lake Iron Co. v. Wakefield Tp.,* 247 U.S. 350, 353 (1918)).[5] The equal protection principle underlying a discrimination claim "protects the individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class." *Allegheny Pittsburgh Coal Co. v. Cnty. Comm'n of Webster Cnty.,* 488 U.S. 336, 345 (1989). It follows that "the fairness of one's allocable share of the total property tax burden can only be meaningfully evaluated by comparison with the share of others similarly situated relative to their property holdings." *Id*. at 346; *see also Crowell v. Cox*, 561 S.W.3d 882, 892 (Mo. App. 2018) (citing *Allegheny* for the proposition a taxpayer alleging a discriminatory assessment has the "burden to show the alleged disparate treatment caused them to bear an unfair share of the property tax burden compared to the other properties").

---

[5] This Court has clarified that, while "*Savage* mentions both the Fourteenth Amendment and the uniformity clause," the analysis focused on whether the assessment was grossly excessive, which "demonstrates the true nature of the Court's analysis was one of equal protection." *Armstrong-Trotwood*, 516 S.W.3d at 837. The article X, § 3 uniformity clause does not apply to Taxpayers' valuation-based discrimination claims because it only requires a uniform "tax rate" and "does not apply to valuations, nor does it impose any obligations or limitations on authorities responsible for valuing or assessing property." *Id.* at 836.

Against this legal backdrop, Taxpayers' ratio discrimination claims required them to prove the FMV of the properties at issue, including their own, and then show an excessive discrepancy between the actual assessment level for their properties and the common level of assessment applied to other properties. *Ashby Road*, 297 S.W.3d at 85; *Savage*, 722 S.W.2d at 78-79. This comparison determines whether the assessments forced Taxpayers to bear an unconstitutionally disproportionate share of the property tax burden. *See Allegheny,* 488 U.S. at 345-46; *Crowell*, 561 S.W.3d at 892.

### *Actual Assessment Level*

Taxpayers claim the STC failed to provide adequate factual findings to calculate the FMV and actual assessment level for most subject properties properly and, therefore, failed to compare the actual assessment level for each property to the common assessment level properly. The STC concluded that, by asserting the BOE and STC decisions proved the FMV of their properties, Taxpayers effectively conceded their properties actually were assessed at the statutory rate of 32% of FMV. Taxpayers contend the STC's use of the BOE and STC values to calculate the actual assessment level is foreclosed by *Zimmerman v. Mid-America Fin. Corp*., 481 S.W.3d 564, 574 (Mo. App. 2015), which held the actual assessment level is based on the assessor's original assessed value, even when the BOE or STC reduces the FMV and assessed value during the administrative review process.

As explained in *Mid-America*, the actual assessment level measures the percentage of FMV at which a property is assessed and is calculated by dividing the assessed value by the FMV. *Id.* at 573. For example, if the assessed value is $40,000 and the FMV is $100,000, the actual assessment level is 40%. According to Taxpayers, the actual

8

assessment level for this hypothetical property remains at 40% even if the BOE or STC subsequently corrects the erroneous assessment and reduces the FMV and assessed value. Assessor argues that, when the BOE or STC corrects an erroneous assessment and reduces the FMV and assessed value, the actual assessment level is based on the corrected value because the corrected values determine the actual tax liability.

In *Mid-America*, the taxpayer asserted a ratio discrimination claim after the assessor determined the FMV of the subject commercial property was $1,460,800, resulting in an assessed value of $467,450. *Id.* at 566. To prove value, the taxpayer relied on a BOE decision reducing the FMV to $1,122,000. *Id.* at 567.[6] The STC calculated the actual assessment level by dividing Assessor's original assessed value of $467,450 by the reduced FMV of $1,122,000 to determine an actual assessment level of 42%. *Id.* at 568-69. Assessor argued the STC erred by relying on his original assessed value and should have calculated the actual assessment level based on the reduced FMV and assessed value as corrected by the BOE and STC. *Id*. at 573. *Mid-America* rejected the assessor's argument and held the actual assessment level is based on the assessor's original assessed value, even when that value subsequently is reduced by the BOE or STC. *Id*. at 574.

*Mid-America* supports this holding by citing *Savage* and *Ashby Road* for the proposition the actual level of assessment is always based on the assessor's original assessed value. *Id*. That is incorrect. This Court has never held an assessor's original value

_____

[6] The *Mid-America* opinion states the BOE and STC determined the FMV was $1,122,000 and at other points states the FMV was $1,222,000. The court's subsequent calculations demonstrate the correct FMV was $1,122,000.

9

must be used to determine the actual assessment level when the BOE or STC subsequently reduced the FMV and assessed value. Neither *Savage* nor *Ashby Road* involved a reduction of the assessor's original value by the BOE or the STC. Instead, in both cases, the assessor's original value was the operative valuation decision setting the assessed value that ultimately determined the property owner's tax liability.[7] The references in *Savage* and *Ashby Road* to the assessor's original value simply reflected the record in those cases while tying the actual assessment level to the valuation decision establishing the property owner's tax liability. Both cases, therefore, are consistent with the principle that an assessment is discriminatory if it causes the property owner to bear more than their "allocable share" of the property tax burden "by subjecting him to taxes not imposed on others of the same class." *Allegheny,* 488 U.S. at 345-46; *see also Crowell*, 561 S.W.3d at 892 (explaining an assessment is discriminatory if it causes a taxpayer "to bear an unfair share of the property tax burden compared to the other properties"). Because the purpose of the discrimination remedy is to relieve a property owner from a disproportionate tax burden, it follows that the actual level of assessment is based on the valuation decision establishing the property owner's actual tax liability. The *Mid-America* holding that the BOE's or STC's corrected assessed value is irrelevant to the actual assessment level divorces the discrimination

---

[7] *Savage*, 722 S.W.2d at 74 (The parties stipulated that the properties were assessed at FMV and the statutory level.); *Ashby Road*, 297 S.W.3d. at 82 (The taxpayers alleged the assessor accurately assessed their properties at the statutory level.). The dissenting opinion's assertion *Savage* and *Ashby Road* show this Court's clear understanding that the actual assessment level must be based on the assessor's discarded original value incorrectly equates this Court's description of the facts of those cases with a legal conclusion.

analysis from the actual disproportionate tax burden on which a discrimination claim is based.

The conclusion that the actual assessment level must account for a subsequent value reduction ordered by the BOE or STC is reinforced by the statutes governing the assessment process. As explained previously, the BOE and STC are authorized to correct and adjust erroneous assessments pursuant to §§ 138.060.1 and 138.430.1. If the BOE or STC corrects an assessment, the county clerk is required to adjust the tax book accordingly. § 138.060.2. Further, §§ 138.430.4 and 139.031.7 provide that filing an STC appeal results in the disputed taxes being "impounded" for a refund if the STC orders a reduced value. These statutorily prescribed steps in the assessment process make it clear that, when the BOE or STC corrects an erroneous assessment, the assessor's original assessed value is discarded, and the actual assessment level determining the actual tax liability is based on the assessed value determined by the BOE or the STC.[8]

---

[8] The dissenting opinion argues the actual assessment level must be based on the assessor's original value because only the assessor can engage in the "intentional systematic undervaluation" of other properties, while the BOE only resolves valuation disputes for a specific property. The respective obligations of assessors and the BOE are part of a comprehensive system of property taxation. *State ex rel. Jackson Cnty. v. Chamberlain*, 679 S.W.3d 463, 465 (Mo. banc 2023). Section 137.115.1 requires the assessor to assess all real property in the county, and this process results in a common assessment level. Equally as important, the BOE's role in this comprehensive process is to correct erroneous assessments for specific properties, resulting in a commensurate adjustment of actual tax liability. § 138.060. The fact the assessor's obligation to assess all property results in a common assessment level does not justify excising the BOE's value adjustment from the equation when those values represents the actual assessment level setting the actual tax liability for a specific property. The fact the assessor may have systematically undervalued other property is an element of the discrimination claim, but the gravamen of the claim is unquestionably to ensure that a specific property owner does not bear an unfair tax burden relative to other taxpayers. *Allegheny*, 488 U.S. at 345-46; *Crowell*, 561 S.W.3d at 892. That is the equal protection principle at issue. *Armstrong-Trotwood*, 516 S.W.3d at 837. Determining whether that principle was violated must account for the BOE's role within the comprehensive property taxation system when

11

This Court previously reached essentially the same conclusion in *Ulman v. Evans*, 247 S.W.2d 693 (Mo. 1952). In *Ulman*, the property owner challenged an assessment valuing the land on her improved lot at $650 per foot of street frontage. *Id*. at 694. The STC affirmed a BOE decision reducing the land value to $450 per foot. *Id*. The property owner petitioned for judicial review of the STC decision, claiming overvaluation and discrimination. *Id*. This Court affirmed the STC decision, holding her discrimination claim failed because she did not produce evidence of general, systematic undervaluation of similar properties to support her discrimination claim. *Id*. at 697-98. This Court, however, further explained, "had there been any evidence suggesting that the assessor deliberately undervalued the other two lot[s] and overvalued plaintiff's, the action of the board of equalization in reducing the value of plaintiff's lot may have obviated the alleged discrimination of which plaintiff complains." *Id*. at 697. The analysis in *Ulman* reflects the fact that, by law, the assessor's original assessed value does not establish the actual assessment level when that original value is discarded following a final decision by the STC correcting the assessed value. Consistent with *Ulman*, the actual assessment level used to analyze a claim of discriminatory assessment and taxation is based on the assessed value that actually determines tax liability. *Mid-America,* therefore, is overruled to the

the BOE adjusts the assessed value and the property owner's actual tax liability. The dissenting opinion's argument distills the incongruent proposition that the actual level of assessment and taxation should not be based on the actual assessed value setting the actual tax liability.

12

extent it holds the actual assessment level is always based on the assessor's original value, even when that value is adjusted by the BOE or the STC.[9]

[9] Taxpayers argue that overruling *Mid-America* severely curtails discrimination claims. While Taxpayers asserted at oral argument that intentional discrimination essentially never occurs, this Court's cases show otherwise. *See Koplar v. State Tax Comm'n*, 321 S.W.2d 686, 689 (Mo. 1959) (Owners of downtown buildings claimed the assessor intentionally discriminated against them by valuing non-downtown buildings at a lower percentage of value.); *Cupples Hesse Corp. v. State Tax Comm'n*, 329 S.W.2d 696, 698 (Mo. 1959) (Commercial property owner claimed discrimination based in part on an allegation commercial property was assessed on a different basis than residential property.); *Breckenridge Hotels Corp. v. Leachman*, 571 S.W.2d 251, 351 (Mo. banc 1978) (Property owners claimed discrimination because new properties were assessed as of 1975 while properties already on the tax roll had not been reassessed since 1964.).

Taxpayers and the dissenting opinion also argue using the corrected assessed values determined by the BOE or STC will practically extinguish ratio discrimination claims. This argument overlooks the fact a property owner can forego an overvaluation remedy and pursue a discrimination claim to obtain a potentially greater reduced value consistent with a below-market common assessment level. *See Savage*, 722 S.W.2d at 74, 79 (The property owner claimed the property was actually assessed at 33.33% of FMV; the parties stipulated to value; and this Court held there was a discriminatory, grossly excessive disparity between the actual assessment level and the common assessment level, thus requiring the assessment to be reduced to the common level.). Further, rather than relying on BOE or STC decisions as evidence of FMV as in this case, a property owner could prove the property's actual FMV according to a recognized valuation methodology, such as the comparable sales approach, the income approach, or the cost approach. *See Snider v. Casino Aztar/Aztar Mo. Gaming Corp.*, 156 S.W.3d 341, 346-48 (Mo. banc 2005) (explaining the FMV of real property typically is determined by one of these three generally accepted approaches). If the actual assessment level based on the actual FMV and the assessor's assessed value is grossly excessive to the common level of assessment, then the property owner may prevail. Alternatively, like Taxpayers, a property owner may choose to prove FMV with a BOE or STC decision and effectively concede the actual assessment level is the statutory rate. As Taxpayers contend, pursuing this strategy does have the practical effect of making it harder to show ratio discrimination. But this difficulty is, in part, a result of the property owner's litigation strategy, which has no bearing on the wholly independent legal question of whether the actual assessment level should account for subsequent reductions in the assessed value as ordered by the BOE or STC. In any event, it is still possible that a comparison of the actual assessment level based on a reduced BOE or STC value may show a sufficient disparity relative to the common assessment level to show the assessment is grossly excessive and discriminatory. Today's decision does not limit discrimination claims; it simply requires them to be analyzed correctly.

*Common Assessment Level*

Because all Taxpayers elected to prove the FMV of their properties by relying either on Assessor's original value or the FMV and assessed value later set by the BOE or STC, each Taxpayer effectively conceded the actual assessment level for their property was the 32% statutory rate. The next steps in the analysis require determining the common assessment level and whether the actual assessment level is "grossly excessive" and discriminatory when compared to the common assessment level. *Savage*, 722 S.W.2d at 78-79.

Taxpayers claim the STC adopted the wrong common level of assessment by ignoring the effects of practically significant "sales chasing" and erroneously relied on a median common assessment level rather than a value-weighted mean to account for the regressive assessment of lower value properties.

**Sales Chasing**

Taxpayers argue the STC erroneously discounted evidence of practically significant sales chasing, which should have invalidated the ratio study prepared by Assessor's expert. Taxpayers argue the STC should have relied on a ratio study prepared by their expert, Gloudemans, because it filtered out the sales chasing in the 2017 assessment data.

Sales chasing undermines the validity of a ratio study by including properties selectively reappraised to their sale price instead of being valued by the assessor's normal valuation procedures. Assessor and Taxpayers agree the International Association of Assessing Officers ("IAAO") Standard on Ratio Studies provides sales chasing must be "practically significant" before a ratio study is invalidated.

14

The STC determined a primary way to test for sales chasing is to compare the values of recently sold properties relative to unsold properties. Assessor's expert, Myers, testified sales chasing may be practically significant if the median value of recently sold properties is 5% higher than other properties. Myers concluded there was no practically significant indication of sales chasing in Assessor's 2017 assessment data because the median value of sold properties was only 3.38% higher than the value of unsold properties. Gloudemans, however, testified a 3% tolerance level is preferable and the 2017 assessment data showed practically significant sales chasing because recently sold properties were valued 3.93% higher than unsold properties. The STC adopted Myers' 5% tolerance level and concluded there was no practically significant sales chasing because both experts concluded sold properties exhibited value increases of less than 4% compared to unsold properties. Taxpayers argue the STC erred by adopting Myers' 5% tolerance level.

The standard of review limits this Court's review to determining whether the STC's factual findings are supported by substantial evidence. Mo. Const. art. V, § 18. "Substantial evidence is that evidence which, if true, has probative force upon the issues, and from which the trier of fact can reasonably decide the case on the fact issues." *Savage*, 722 S.W.2d at 77 (alteration omitted) (internal quotation omitted). This Court defers to the STC's findings of fact and recognizes the proper methods for valuing and assessing property are delegated to the STC. *Id.* at 75.

Taxpayers' argument distills to an assertion this Court should re-weigh the evidence and substitute its judgment for the STC's finding that Myers' "data-based justification" persuasively established there was no practically significant sales chasing. The STC noted

15

Myers' offered data showing both sold and unsold properties demonstrated significant value changes, thus providing a "reasonable justification" for a 5% tolerance level. The 5% tolerance level was also supported by Gloudemans' data showing the three areas with the highest densities of valid sales were also three of the four areas exhibiting the highest median change in value between sold and unsold properties. Finally, the STC noted Myers' preferred 5% tolerance level was consistent with the "prudent 3% to 5% range recommended in the IAAO textbook" Gloudemans authored. The STC's adoption of a 5% tolerance level is supported by competent substantial evidence.

Taxpayers also argue the STC's sales chasing analysis erroneously adopted Myers' use of the median, rather than the mean, to measure the difference between sold and unsold properties. Taxpayers argue the IAAO references the "average." While the IAAO uses the word "average," the record shows the IAAO standards are based, in part, on a study using the median. Moreover, Myers testified he used the median rather than the mean because the mean may be distorted by small numbers of outliers with large value discrepancies. Myers also reanalyzed the properties using the mean and still concluded a less than 5% difference between sold and unsold properties. Viewed in the light most favorable to the STC's decision, *Savage*, 722 S.W.2d at 75, the STC's finding that there was no practically significant sales chasing is supported by competent and substantial evidence.

## Regressive Assessments

Taxpayers claim the STC erred in finding the 2017 assessment data did not demonstrate regressive assessments, thus warranting the use of a value-weighted mean to measure the common assessment level rather than the median. A value-weighted mean or median gives equal weight to each dollar of value in the sample, thus assigning more weight to high value properties and less weight to low value properties. Taxpayers argue a value-weighted mean is necessary to account for regressivity resulting from lower value properties being assessed a greater percentage of FMV than higher value properties.

The STC found the preferred metric for detecting regressive assessment is the price-related bias coefficient ("PRB"). Relying on IAAO standards, the STC concluded the PRB should fall between -0.05 and 0.05 and that measures within -0.10 and 0.10 are generally acceptable. Gloudemans calculated a PRB of -0.063. Myers calculated a PRB of -0.032. Both experts' calculated values are within the acceptable range set by the IAAO. The STC also concluded a value-weighted mean or median is not the best measure of the common assessment level for all commercial properties because it emphasizes the assessment level for high value properties. Based on this evidence, the STC concluded Taxpayers did not produce persuasive evidence of actionable regressivity. The STC's adoption of a median common assessment level is supported by competent and substantial evidence.

### *The actual assessment level was not grossly excessive*

Having determined the STC properly relied on the median common assessment level, the dispositive issue for the discrimination claims is whether the actual assessment level was grossly excessive compared to the median common assessment level. *Savage,*

722 S.W.2d at 78-79. The STC found the median common assessment level was between 30% and 30.5%, as determined by the expert witnesses. The STC further found these common assessment levels were between 4.6% and 6.3% below the 32% actual assessment level applied to Taxpayers' properties.

*Mid-America* correctly observed "neither Missouri courts nor the STC has established a 'bright-line' test to identify what constitutes a grossly excessive assessment as opposed to a mere *de minimus* error in judgment." *Mid-America*, 481 S.W.3d at 575. *Savage* held a 59% disparity was grossly excessive. 722 S.W.2d at 79.[10] Similarly, in *Ben Enterprises v. Morton*, Appeal No. 89-11166 (Mo. State Tax Comm'n 1991), the STC compiled a list of cases from other jurisdictions holding disparities in excess of 30% were grossly excessive to support the conclusion a 9.6% disparity was not grossly excessive. While *Savage* and cases from other jurisdictions establish a disparity in excess of 30% is grossly excessive generally, the STC repeatedly has concluded disparities of less than 15% are not grossly excessive.[11] The 4.6% to 6.3% disparity between the actual and common levels of assessment in this case is considerably less than the 59% disparity in *Savage* and is within the range the STC previously concluded is permissible. Taxpayers provide no

---

[10] In 1980, the common assessment level for commercial properties in Greene County was 20.9% of FMV while the properties at issue were actually assessed at 33.33% of FMV. The disparity between the common assessment level and the actual assessment level was, therefore, 59% [33.33 - 20.9] / 20.9 = 59.47.

[11] *See, e.g., Foci Enter., LLC v. Zimmerman,* Appeal No. 15-10103 (Mo. St. Tax Comm'n 2018) (finding a 3% disparity not grossly excessive); *Arsenal Street, LLC v. Bushmeyer*, Appeal Nos. 05-20386 and 05-20387 (Mo. St. Tax Comm'n 2009) (finding a 9.8% disparity was not grossly excessive); *West Cnty. BMW v. Muehlheausler*, Appeal No. 05-125692 (Mo. St. Tax Comm'n 2009) (finding a 14% disparity was not grossly excessive).

18

persuasive authority or argument showing the single digit disparity in this case is grossly excessive.

### Discovery

Taxpayers claim the STC abused its discretion by quashing subpoenas for depositions directed to Assessor and several review appraisers. They further claim the STC erroneously concluded the hearing officer did not abuse her discretion by limiting discovery regarding the Assessor's CAMA system and assessment practices.

An STC discovery order is reviewed for abuse of discretion. *Daly v. State Tax Comm'n*, 120 S.W.3d 262, 267 (Mo. App. 2003). An abuse of discretion occurs when a decision is "clearly against the logic of the circumstances … and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Cox v. Kan. City Chiefs Football Club, Inc*., 473 S.W.3d 107, 114 (Mo. banc 2015).

Taxpayers' argument the STC abused its discretion by quashing Assessor's deposition is foreclosed by the fact the hearing officer overruled Assessor's motion to quash the depositions of the two senior staff members, both of whom had direct knowledge of St. Louis County assessment practices, including the final review process. Allowing Taxpayers to depose senior staff rather than Assessor is consistent with this Court's recognition that "[p]ersons lower in the organization may have the same or better information" than organizational leaders. *State ex rel. Ford Motor Co. v. Messina*, 71 S.W.3d 602, 606 (Mo. banc 2002). The STC did not abuse its discretion by quashing the subpoena for Assessor's deposition.

19

The STC also denied deposition requests for 11 staff appraisers. Taxpayers asserted the appraisers had information regarding sales chasing and flaws in Assessor's appraisal practices. Taxpayers, however, discovered the appraisers' identities earlier in the discovery process and waited until days prior to the evidentiary hearing to notice the depositions. Under these circumstances, there is no persuasive basis for concluding the hearing officer abused her discretion by balancing additional discovery with the goal of avoiding further delay.

Finally, Taxpayers claim the hearing officer abused her discretion by denying access to Assessor's independent appraisal and CAMA system. The hearing officer entered an unambiguous scheduling order based on input from Taxpayers and Assessor. The parties conducted substantial discovery over several month's while they prepared, exchanged, and submitted written testimony and exhibits. The hearing officer resolved numerous discovery motions and conducted several motion hearings. The record shows the hearing officer and the STC carefully considered the discovery requests, specifically weighing the delay versus the potential for gaining relevant and useful information. The STC did not abuse its discretion.

## Conclusion

The circuit court's judgment is vacated. The STC decision and order concluding Taxpayers failed to prove their discrimination claims is authorized by law and based on substantial and competent evidence. The STC did not abuse its discretion by denying discovery requests and limiting depositions. The STC decision and order is reinstated pursuant to Rule 84.14.

_____
Zel M. Fischer, Judge


Russell, C.J., Powell and Ransom, JJ., and
Stevens, Sp.J., concur.
Wilson, J., dissents in separate opinion filed;
Gooch, J., concurs in opinion of Wilson, J.
Broniec, J., not participating.



# SUPREME COURT OF MISSOURI
## en banc

CROWN DIVERSIFIED              )
INDUSTRIES CORP., ET AL.,      )
                              )
    Respondents,               )
                              )
v.                            )    No. SC100219
                              )
 JAKE ZIMMERMAN,              )
ASSESSOR, ST. LOUIS COUNTY     )
                              )
    Appellant.                 )

## DISSENTING OPINION

The principal opinion rejects Taxpayers' appeal and holds that, for purposes of finding assessment discrimination, the correct method of calculating the actual assessment of property is to ignore the assessor's original calculations and, instead, use the revised value calculated by the board of equalization ("BOE"). This is a question of first impression in this Court, but the court of appeals reached the opposite conclusion in *Zimmerman v. Mid-America Financial Corp*., 481 S.W.3d 564 (Mo. App. 2015). I believe *Mid-America* properly resolves this question; therefore, I respectfully dissent.

1

To determine a property owner's tax bill, the assessor is charged with performing a statutorily required appraisal of the property.[1]  For commercial property, the assessor first determines a property's fair market value ("FMV").  Next, the assessor multiplies the FMV by the statutorily determined assessment ratio of 32 percent to determine the assessed value of a piece of property.  This assessed value is the basis of the property owner's tax bill.[2]

A taxpayer who feels his or her property has been wrongly assessed may appeal the assessor's valuation of the property to the county's BOE.[3]  The BOE will then hold a hearing and issue a decision.  If a taxpayer is successful, the BOE will reduce the FMV of the taxpayer's property, and the 32 percent assessment ratio is applied to that revised FMV to determine the taxpayer's tax liability.  If the taxpayer is not satisfied with the ruling from the BOE, the taxpayer may appeal to the Missouri State Tax Commission ("STC").

### Taxpayers' Discrimination Claim

In the present case, Taxpayers appealed the assessor's valuation of their properties to the BOE and, thereafter, to the STC, alleging discrimination.  According to Taxpayers,

---

[1]  Section 137.115.1 requires the assessor the assess "the true value in money" of all real property.  All statutory references are to RSMo 2016 unless otherwise noted.

[2]  The assessment ratio is determined by statute and varies depending on the type of real property.  Section 137.115.5.  Taxpayers' properties are commercial properties.  *See* section 137.016.1(3) (defining commercial property). Therefore, 32 percent is the appropriate assessment ratio.  Section 137.115.5(1)(c).

[3]  Taxpayers of St. Louis who wish to appeal their assessment "may appeal in writing to the board of equalization from the assessment of his property …." Section 138.180.

2

they paid real estate taxes at a rate disproportionately higher than the common taxpayer in 2017.

Article X, section 3 of the Missouri Constitution provides, "Taxes may be levied and collected for public purposes only, and ***shall be uniform*** upon the same class or subclass of subjects within the territorial limits of the authority levying the tax." (Emphasis added). In bringing a discrimination claim, a taxpayer alleges the assessor has "violate[d] the constitutional requirement of uniformity." *Savage v. State Tax Comm'n of Mo.*, 722 S.W.2d 72, 78 (Mo. banc 1986).

To prevail on a discrimination claim, a taxpayer must prove an intentional plan of discrimination. *St. Louis Elec. Bridge Co. v. Koeln,* 287 S.W. 427, 429 (Mo. banc 1926). In the absence of direct evidence of discriminatory intent, however, the taxpayers may prove "systematic undervaluation by state officials of other taxable property in the same class." *State ex rel. Ashby Rd. Partners, LLC v. State Tax Comm'n*, 297 S.W.3d 80, 85 (Mo. banc 2009) (alteration and quotation omitted). This latter type of discrimination is also known as "ratio" discrimination. Here, Taxpayers assert the St. Louis County assessor engaged in ratio discrimination.

As explained in *Ashby*, the first step toward proving a ratio discrimination claim is to calculate the "actual level of assessment," i.e., the ratio showing "the percentage of true market values at which their properties are assessed." *Id.* Second, the taxpayer must show the "median level of assessment," i.e., the ratio showing the common or average "percentages of true market values at which the comparable properties are assessed." *Id.* The former is then compared with the latter to see if the assessor engaged in ratio

3

discrimination. *Id.* Discrimination is found only if the taxpayer's actual level of assessment is "so grossly excessive [when compared to the median level of assessment] as to be entirely inconsistent with an honest exercise of judgment." *Cupples Hesse Corp. v. State Tax Comm'n*, 329 S.W.2d 696, 700 (Mo. banc 1959) (quotation omitted).

The question before the Court in this case is whether, in calculating the actual level of assessment, the assessor's valuation of Taxpayers' properties should be used or the BOE's valuation if it is different. The principal opinion holds it is the latter. Taxpayers – and the court of appeals in *Mid-America* – suggest it is the former, and I agree.

In *Mid-America*, the taxpayer appealed the assessor's assessment of its commercial property to the BOE. *Mid-America*, 481 S.W.3d at 566. The BOE determined that the assessor had overestimated the FMV of the property and revised that number downward. *Id.* at 567. Not fully satisfied, the taxpayer appealed to the STC, asserting the assessor had engaged in ratio discrimination by systematically undervaluing other similar properties in the county. *Id.* The STC used the assessor's original valuation to calculate the actual level of assessment, i.e., the percentage of FMV at which the property was assessed. *Id.* at 568.

On appeal, the court of appeals rejected the assessor's argument that the STC should have used the BOE's revised valuation – not the assessor's original valuation – to calculate the actual level of assessment. *Id.* at 574 ("[T]he proper method of determining discrimination is to compare the ***actual level of assessment of the subject [taxpayer's] property as determined by that assessor*** to the medial level of assessment for

4

similarly-situated properties." (emphasis in original)). *Mid-America* emphasizes the correct method for calculating the actual assessed value was to use the assessor's original assessed value, i.e., the assessor's determination of FMV times the statutorily required ratio of 32%. *Id.* This is because the basis for Mid-America's tax bill was the assessed value of the property by the **assessor**, not the BOE. *Id.* at 575. In other words, the fact that the taxpayer received partial (or even complete) relief from the BOE regarding the proper FMV of the taxpayer's own property does not – and should not – have any impact on whether the taxpayer successfully proved the very different claim (i.e., ratio discrimination) that the assessor had systematically undervalued some properties compared with others in the same class. The court stated:

> The Assessor's argument misses the point of discrimination claims. The central question before the STC was whether the *Assessor* discriminated against Mid-America by virtue of the actual level of assessment the Assessor imposed upon the Property in *2007*. The Assessor may not retroactively substitute the FMV determination of the BOE, a separate entity, for its own valuation in order to diminish the severity of its over-assessment of the Property. Further, as the STC explained, the Assessor's position fails to recognize the "two separate factors of the discrimination equation"—value *and* ratio. This principle is precisely why the STC could not compare 32% to 29.4%, and why the Assessor's determination of the Property's FMV and assessed value simply may be not ignored.

*Id*. (emphasis in original).

Though the issue now before this Court is one of first impression, this Court from time to time has made clear its understanding that a discrimination claim (whether proved with direct evidence or statistical evidence of "ratio" discrimination) is a claim against – and concerns the work of – the assessor. In *Savage*, this Court noted "the intentional act of an **assessor** in assessing certain types of property at a higher rate than other property

5

within the same class violates the constitutional requirement of uniformity." *Savage*, 722 S.W.2d at 78 (emphasis added). Similarly, in *Ashby* this Court stated the taxpayer "must persuade the commission that the ***assessor*** discriminated against them by assessing their properties at a higher percentage of value in comparison with other similar properties in the taxing area …." *Ashby*, 297 S.W.3d at 88 (emphasis added).

*Mid-America* expressly relies on this Court's understanding of discrimination claims as expressed in *Savage* and *Ashby*, and the holding in *Mid-America* should be adopted by this Court. The assessor's valuation is the one that should be used to evaluate a taxpayer's discrimination claim because the assessor is the only official in a position to engage in the sort of "intentional systematic undervaluation" of properties that this Court has stated lies at the heart of a discrimination claim. *Ashby*, 297 S.W.3d at 85. The BOE cannot engage in an intentional and systematic overvaluation of some properties within a class and undervaluation of others because a BOE has no authority (let alone obligation) to assess all properties in a county. Only the assessor has that obligation. The role of the BOE, on the other hand, is to resolve disputes over the value of a particular piece of property when that taxpayer contests the assessor's valuation.

A taxpayer who convinces the BOE to decrease the assessor's original valuation may receive all – or only part[4] – of the relief the taxpayer seeks. Before the STC, the

---

[4] The key to the calculations in a discrimination claim is FMV, both for the taxpayer's property and the similarly situated properties with which that assessment is compared. *Ashby*, 297 S.W.3d at 85 ("Inherent in a discrimination action is the comparison of the assessor's determination of true market value of the property claimed to be discriminated against with that of the other property in the same class."). If the assessor's valuation of every property exactly equaled that property's FMV, the actual level of assessment of the

6

taxpayer can continue to challenge the valuation of the taxpayer's property and/or the

taxpayer can pursue a discrimination claim. But these two types of claims (i.e., valuation

disputes and discrimination claims) are different. They proceed from different theories

and are intended to remedy different wrongs. Properly understood, this demonstrates

why a claim of discrimination – aimed at identifying and curbing intentional wrongdoing

by the assessor concerning valuations across the county – cannot be evaluated using the

revised valuation calculated by the BOE. Even if every BOE decision arrives precisely at

the true FMV of every disputed property (an ambitious assumption at best), the BOE's

valuations will never show (in fact, they will conceal) that the assessor engaged in

intentional discrimination no matter how intentionally and systematically erroneous the

---

taxpayer's property would be .32 percent (i.e., the assessor's valuation divided by actual FMV equals 1.0, and 1.0 times .32 is .32). And, the actual assessment ratio of the similarly situated properties also would be 32 percent (i.e, the assessor's valuation of the median property divided by actual FMV of that property equals 1.0, and 1.0 times .32 is .32). In that case, there is no discrimination. But, if the assessor intentionally underestimates the value of similarly situated properties *or* intentionally overestimates the taxpayer's (and, potentially, other's) property, it causes both assessment ratios to depart from the statutory amount. For example, when the assessor overstates the value of the taxpayer's property, the result of dividing the assessor's valuation by the FMV rises above 1.0; therefore, multiplying that resulting number by the statutory .32 will yield a number greater than .32. Similarly, when the assessor intentionally understates the value of similarly situated properties, the result of dividing the assessor's valuation by the FMV drops below 1.0; therefore, multiplying that resulting number by the statutory .32 will yield a number less than .32. When either – or both – occurs, and the difference is "so grossly excessive as to be entirely inconsistent with an honest exercise of judgment," *Cupples Hesse Corp.*, 329 S.W.2d at 700 (quotation omitted), discrimination has occurred, and the taxpayer is entitled to relief. Accordingly, even when the taxpayer gets all the relief the BOE is authorized to give (i.e, a perfectly calculated FMV for that taxpayer), and even if the assessor agrees to tax based on that number, a discrimination claim before the STC, nevertheless, can afford the taxpayer additional relief if the taxpayer can show that the assessor intentionally and systematically undervalued similarly situated properties in the same class.

assessor's valuations were.  Accordingly, because I would adopt the holding in *Mid-America* and use the valuations done by the assessor in evaluating a ratio discrimination claim, I respectfully dissent.

_____
Paul C. Wilson, Judge